Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
07/10/2024 06:09 PM CDT

- 932 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

In re Interest of Quiotis C., Jr.,
a child under 18 years of age.
State of Nebraska, appellee, v.
Quiotis C., Jr., appellant.

___ N.W.3d ___

Filed June 4, 2024.    No. A-23-495.

1. **Appeal and Error.** An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting error to be considered by the appellate court.

2. ____. In appellate proceedings, the examination by the appellate court is confined to questions which have been determined by the trial court.

3. **Courts: Appeal and Error.** An appellate court will not consider an issue on appeal that was not passed upon by the trial court.

4. **Constitutional Law: Criminal Law: Jury Trials.** Both the Nebraska and the U.S. Constitutions mandate a right to a jury trial for criminal trials.

5. **Constitutional Law: Juvenile Courts: Jury Trials.** A jury trial is not required under the U.S. Constitution in a juvenile court's adjudication.

6. **Constitutional Law: Statutes: Juvenile Courts: Jury Trials.** Under Nebraska statutes, a juvenile court proceeding is a civil proceeding, and under the doctrine of parens patriae, the constitutional guarantees of a jury trial and the incidents thereto are not applicable to a juvenile proceeding.

7. **Constitutional Law: Criminal Law.** The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial.

8. **Juvenile Courts: Appeal and Error.** The standard of review for juvenile cases is de novo on the record; however, when evidence is in conflict, the appellate court may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other.

- 933 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

9. **Witnesses: Evidence: Appeal and Error.** An appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error.

10. **Juvenile Courts: Proof.** When an adjudication is based upon Neb. Rev. Stat. § 43-247(1), (2), (3)(b), or (4) (Reissue 2016), the allegations must be proved beyond a reasonable doubt.

11. **Criminal Law: Evidence: Police Officers and Sheriffs.** The crime of tampering with physical evidence, as defined by Neb. Rev. Stat. § 28-922(1)(a) (Cum. Supp. 2022), does not include mere abandonment of physical evidence in the presence of law enforcement.

12. **Criminal Law: Evidence.** To "conceal" or "remove" physical evidence, in the context of Neb. Rev. Stat. § 28-922(1)(a) (Cum. Supp. 2022), is to act in a way that will prevent the evidence from being disclosed or recognized.

13. **Motions for Mistrial: Prosecuting Attorneys: Waiver: Appeal and Error.** A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct.

Appeal from the Separate Juvenile Court of Douglas County: Matthew R. Kahler, Judge. Affirmed.

Timothy L. Ashford for appellant.

Laura Lemoine, Deputy Douglas County Attorney, for appellee.

Pirtle, Chief Judge, and Riedmann and Bishop, Judges.

Riedmann, Judge.

## I. INTRODUCTION

This appeal raises the issue of a juvenile's rights when adjudicated in the juvenile court for violation of criminal statutes. At the heart of the juvenile's argument is his contention that he was entitled to a jury trial. He also argues the evidence was insufficient to support his adjudication. Following our review of the record, we affirm.

- 934 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

## II. BACKGROUND

Robert Stolinski hosted a pool party at his residence on September 5, 2022. Among the group of attendees were Mister Parker; Brandon Butler; Quiotis C., Sr. (also known as Tiger); Tiger's 14-year-old son, Quiotis C., Jr. (Quiotis); and Quiotis' 8-year-old cousin, R.S.

### 1. Parker and Tiger's Altercation

Tiger, Quiotis, and R.S. were outside the Stolinski residence when Parker went to get money from his car. While walking back to the residence, Parker and Tiger exchanged words. Parker punched Tiger in the face, causing him to collapse and knocking him unconscious.

Parker continued to approach Tiger after rendering him unconscious. At some point during the altercation, Quiotis gained possession of a handgun. Witness testimony reported hearing four shots that were fired. According to Quiotis, the first two shots were warning shots; the other two shots struck Parker, one in the shoulder and one in the back. The gunshot wounds caused Parker to retreat to the Stolinski residence where partygoers called the 911 emergency dispatch service. Parker later died. Quiotis fled the scene.

A neighbor, Lawrence Summers, also called the 911 dispatch service to report a disturbance shortly after he heard gunshots nearby. He reported to the 911 dispatcher that he saw a "kid" hiding in the field along the ridgeline. He described the kid as running south on the street that ran the length of the field. Summers relayed that the kid had "something in his hand but it didn't look like a gun or anything." Summers would later identify Quiotis as the kid he witnessed in the field.

Officers arrested both Tiger and Quiotis. Tiger and Quiotis were transported to police headquarters where they both invoked their right to remain silent and their right to counsel. Photographs were taken of Tiger, who had a swollen lip and discoloration on the left side of his face. Tiger testified at trial that he sustained a severe concussion and a black eye as a result of the altercation. Quiotis had no physical injuries.

- 935 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

## 2. Locating Evidence After Shooting

The day after the shooting, officers fanned out throughout the neighborhood and nearby field to locate additional evidence. Summers directed them to the area where he had seen Quiotis the day before. Through their search, officers were able to locate five pieces of a handgun, all within 10 feet of one another.

Witnesses detailed they heard multiple shots on September 5, 2022, but the physical evidence only evinced two shots were fired. Officers located only one shell casing at the scene. The officer that collected the individual pieces of the firearm from the field tested each piece for fingerprints, then reassembled the handgun. The reassembled handgun was delivered to the forensics investigation unit where it was tested and determined to be functional. Ballistics matched the shell casing to the handgun.

On September 7, 2022, the State filed a petition in the separate juvenile court of Douglas County, alleging under count I that Quiotis had committed manslaughter and under count II that Quiotis had used a firearm to commit a felony. At the detention hearing, Quiotis entered a plea of denial to both counts, and the court ordered that Quiotis be detained in the Douglas County Youth Center until further order.

## 3. Pretrial Motions

Prior to trial, Quiotis filed a series of motions with the juvenile court. On October 14, 2022, Quiotis filed a motion for request for bond review. The juvenile court denied the motion and instead ordered that Quiotis be released to the custody of juvenile probation once placement at the juvenile justice center was secured. Subsequently, on January 11, 2023, the court entered a release order directing that Quiotis be placed at the Douglas County Youth Center but ordering that he be rescreened for the "HOME Program," and if accepted, to reside in the home of his mother.

- 936 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

On January 16, 2023, Quiotis motioned for placement in the "H.O.M.E. Program." The juvenile court dismissed the motion as moot. It explained it previously ordered the H.O.M.E. Program to screen Quiotis and for Quiotis to be released to the H.O.M.E. Program if he was accepted. Because Quiotis' placement in the H.O.M.E. Program was contingent upon his acceptance into the program and not subject to court order, the court stated it had addressed Quiotis' motion to the fullest extent possible.

On March 6, 2023, the State filed an amended petition. In addition to the original two counts of manslaughter and use of a deadly weapon (firearm) to commit a felony, it added two additional counts: count III, tampering with physical evidence, and count IV, possession of a handgun by a minor.

On March 12, 2023, Quiotis filed a motion to appoint an expert. The juvenile court denied Quiotis' motion. At a preliminary hearing on the amended petition on March 13, Quiotis entered a plea of denial to all four counts.

(a) Amended Plea in Abatement

On March 26, 2023, Quiotis filed an amended plea in abatement. He claimed that he did not have a meaningful preliminary hearing for counts I and II when the juvenile court held the preliminary hearing for counts III and IV. Quiotis also requested to take the depositions of Officer Jordan Brandt and Omaha Police Chief Todd Schmaderer.

The juvenile court denied Quiotis' amended plea in abatement. It explained there is no procedure in the Nebraska Juvenile Code to allow for a plea in abatement and a plea in abatement "typically involves a review by the District Court of a finding of probable cause by the County Court." It noted that Quiotis had also already entered a plea of denial as to the amended petition on March 13, 2023. It granted Quiotis' request to take the deposition of Brandt but denied his request to depose Schmaderer because he was not listed as a witness and there was no evidence that he was directly involved in any aspect of the investigation for this matter.

- 937 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

### (b) Motion for Juvenile Jury Trial and Motion to Declare Statutes Unconstitutional

On April 12, 2023, Quiotis filed numerous motions, including a motion for a juvenile jury trial, a motion to allow court payment for an expert, and a motion to declare numerous statutes unconstitutional, specifically, Neb. Rev. Stat. §§ 28-305 (Reissue 2016), 28-922 (Cum. Supp. 2022), 28-1204 (Reissue 2016), and 28-1205 (Reissue 2016). He subsequently filed a motion to dismiss/demurrer.

The court addressed all motions at one hearing and, in a written order, denied all of them. It denied his motion for a jury trial pursuant to Neb. Rev. Stat. § 43-279(1) (Reissue 2016), which provides that "[t]he adjudication portion of hearings shall be conducted before the court without a jury, applying the customary rules of evidence in use in trials without a jury." It found the motion to declare statutes unconstitutional was untimely because Quiotis entered denials to both the petition and amended petition prior to filing the motion, thereby waiving all defects. It denied his motion to allow court payment for an expert because it did not contain evidence or argument that Quiotis was indigent and lacked the financial resources to retain an expert. It denied Quiotis' motion to dismiss/demurrer for lack of argument consistent with Neb. Rev. Stat. § 29-1810 (Reissue 2016) and for raising defenses that could be asserted at the adjudication hearing.

### 4. Adjudication

### (a) R.S. and Summers' Testimony

At the adjudication, R.S., who was 9 years old at the time of trial, testified to his memory of the altercation between Parker and Tiger. R.S. testified that Parker punched Tiger and knocked him to the ground. Parker was going to punch Tiger again, but then Quiotis shot Parker. R.S. was sitting on the ground next to Quiotis during the altercation. After the shooting, R.S. ran inside to alert his mother.

- 938 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

R.S. first testified that Quiotis picked up the gun after it fell out of Tiger's pocket when he collapsed from the punch. R.S. testified that he had not seen the handgun before. The State then reminded R.S. that at his forensic interview, he told the interviewer that Quiotis had the gun in a fanny pack that he was wearing draped across his shoulder. R.S. confirmed that earlier in the day on September 5, 2022, he saw the handle of a pistol in Quiotis' fanny pack while they were inside the Stolinski residence. R.S. admitted he saw only a portion of the handgun, as it was inside the fanny pack that Quiotis was wearing.

On cross-examination, R.S. admitted that in his deposition, he testified that he did not see Quiotis with a gun prior to the shooting. R.S. maintained at trial, however, that he did see Quiotis with the gun prior to the shooting, and Tiger did not have the gun. R.S. testified he was telling the truth at trial despite his prior inconsistent statement in his deposition.

Summers also testified about his recollection of the events that occurred on September 5, 2022, and the following day. Summers was asked a variety of questions regarding what he observed in Quiotis' hands when Summers made his 911 call. He first testified that Quiotis was carrying "some kind of bag, a dark-colored backpack or fanny pack or something. It could have been a grocery sack or something. It was kind of a dark-colored bag." He was asked to describe the bag he saw, and he answered that "[i]t had a strap but I couldn't tell if it was a fanny pack or a backpack [or] something."

### (b) Quiotis' Recollection of Shooting

Quiotis disputed much of the testimony about his possession of the handgun and the events that followed the shooting. Quiotis testified that he did not own a fanny pack. When he left his house on September 5, 2022, the only thing he took with him was his phone. At the Stolinski residence, Tiger and Quiotis were about to leave when Parker and Tiger got into the altercation. According to Quiotis, when Parker struck

Tiger and knocked him unconscious, a handgun fell from Tiger's waist and landed approximately 2 feet from Quiotis. Quiotis disputed that Tiger had been hit only once; instead, Quiotis testified, "I'm not sure how many times Mister Parker hit my dad, but he definitely hit him more than one time."

Quiotis recalled that he picked up the gun, then yelled, "'Stop.'" Quiotis explained that when Parker did not stop, he fired two warning shots. Because Parker did not seem to notice, Quiotis fired one shot at Parker's back. Parker was on top of Tiger at this point. Quiotis testified the one shot did not seem to affect Parker, so he then fired a second time.

After Parker retreated inside the house, Quiotis checked on Tiger to make sure he was alive. He then called his mother and began to run home, which was not far. Quiotis testified that he feared if the police found him with a handgun, they would shoot him. He did not want to dispose of a functional gun because he did not want another person to find the gun and use it. So Quiotis disassembled the pistol into five pieces and scattered the pieces throughout the tree line, all within 15 feet of each other. When asked what he thought was going to happen, Quiotis responded that he believed he would be home later that night, as he did not think he had done anything wrong.

Quiotis acknowledged that he possessed the gun that night to protect Tiger. He acknowledged he did not tell police about the handgun or where it could be found, despite officers' asking multiple times where he had discarded it.

Quiotis' mother testified that when Quiotis left the house on September 5, 2022, he brought only his phone with him. She claimed he did not own a fanny pack, much less have one the last time she saw him before the shooting. Butler also testified that on September 5, he never saw Quiotis with any kind of bag.

### 5. JUVENILE COURT ADJUDICATION ORDER

After the adjudication hearing, the juvenile court issued a written order finding that there was insufficient evidence to

- 940 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

find that Quiotis violated the statutes for manslaughter and use of a deadly weapon to commit a felony. Because Quiotis raised the affirmative defense of defense of others, the juvenile court found it was the State's burden to show that Quiotis' actions did not fall under the guidelines of Neb. Rev. Stat. §§ 28-1409 and 28-1410 (Reissue 2016). It found the State failed to meet this burden and dismissed the charges for manslaughter and use of a deadly weapon to commit a felony. Because Quiotis was not adjudicated on these charges, we need not discuss them further, or the facts upon which they were based. Rather, we focus our analysis on the two violations found by the juvenile court: tampering with physical evidence and unlawful possession of a handgun.

As it relates to these two violations, the juvenile court found that following the shooting, Quiotis ran from the area, hid, then disassembled the handgun "into several pieces and threw each piece under separate trees." It explained that the evidence showed Quiotis' actions of disassembling the weapon was an attempt to conceal the weapon from discovery and render it unrecognizable as individual parts because he was concerned that he would encounter law enforcement.

The juvenile court ordered that Quiotis undergo a psychological evaluation arranged by juvenile probation, participate in individual therapy, and abide by the rules of his "shelter care placement." It placed him under the supervision of a probation officer subject to the terms and conditions of his probation. It ordered Quiotis to remain in such placement until further order by the juvenile court. Quiotis appeals.

## III. ASSIGNMENTS OF ERROR

Quiotis' 25 assignments of error can be grouped into five categories, including the juvenile court erred in (1) denying him a jury trial, (2) denying his numerous pretrial motions, and (3) finding the evidence sufficient to support an adjudication for tampering and minor in possession of a firearm. He also (4) challenges the constitutionality of several statutes and (5) asserts the prosecutor engaged in misconduct.

- 941 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

## IV. STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Zoie H.*, 304 Neb. 868, 937 N.W.2d 801 (2020). When the evidence is in conflict, however, an appellate court may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Elijahking F.*, 313 Neb. 60, 982 N.W.2d 516 (2022).

## V. ANALYSIS

### 1. Compliance With Appellate Rules

[1] As a preliminary issue, Quiotis' brief fails to comply with the appellate court rules. He assigns that the juvenile court abused its discretion by denying his motion to appoint an expert, granting the State's motion to amend, denying his motion to dismiss/demurrer, denying his motion for placement in the H.O.M.E Program, denying his plea in abatement, denying his subpoena for the Omaha police chief, denying his motion for bond review, and denying his motion for payment for an expert. None of these assignments of error are argued. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting error to be considered by the appellate court. *State v. Sundquist*, 301 Neb. 1006, 921 N.W.2d 131 (2019). Because his assignment of error related to the denial of his pretrial motions is not argued, we do not review it.

Quiotis asserts a facial and as an applied challenge to the constitutionality of §§ 28-305, 28-922, 28-1204, and 28-1205. The only portion of his brief addressing this assignment of error provides

> The Court erred because [Quiotis] asserts a facial challenge that the statutes are unconstitutional and the statutes as applied to [Quiotis] are unconstitutional because when a criminal-law term is used in the criminal-law

- 942 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

statutes . . . that, in and of itself, is a good clue that it takes its criminal-law meaning and is not civil.

Brief for appellant at 27. Quiotis does not specifically address why each statute is unconstitutional. As stated above, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting error to be considered by the appellate court. *State v. Sundquist, supra*. An argument that does little more than restate an assignment of error does not support the assignment, and an appellate court will not address it. *Id*. Here, Quiotis' argument regarding the constitutionality of the criminal statutes does little more than restate his assignment of error. Without analysis, his assigned error evades review.

[2,3] We further note that the juvenile court never addressed the constitutionality of these statutes on the merits because it found the motion challenging them was untimely. In appellate proceedings, the examination by the appellate court is confined to questions which have been determined by the trial court. *Maxwell v. Montey*, 262 Neb. 160, 631 N.W.2d 455 (2001). An appellate court will not consider an issue on appeal that was not passed upon by the trial court. *J.B. Contracting Servs. v. Universal Surety Co.*, 261 Neb. 586, 624 N.W.2d 13 (2001). The Nebraska Supreme Court has held that a constitutional issue not presented to or passed upon by the trial court is not appropriate for consideration on appeal. See *In re Adoption of Luke*, 263 Neb. 365, 640 N.W.2d 374 (2002).

This leaves Quiotis with three assigned errors: The juvenile court erred in denying him a jury trial and in finding the evidence sufficient to adjudicate him for tampering and being a minor in possession of a firearm, and the prosecutor engaged in misconduct.

## 2. RIGHT TO JURY TRIAL

Quiotis raises three arguments to support his assignment of error that the juvenile court erred by denying him a jury trial.

- 943 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

First, he argues it violates the Nebraska and U.S. Constitutions that mandate the right to a jury trial for criminal proceedings. Second, he argues that § 43-279 is unconstitutional. Finally, he argues that denying him a jury trial is a structural error, which he claims rendered his trial fundamentally unfair. We address each of his arguments separately.

### (a) Constitutional Guarantees

[4,5] Both the Nebraska and the U.S. Constitutions mandate a right to a jury trial for criminal trials. See *In re Interest of Zoie H*., 304 Neb. 868, 937 N.W.2d 801 (2020). In *McKeiver v. Pennsylvania*, 403 U.S. 528, 91 S. Ct. 1976, 29 L. Ed. 2d 647 (1971), the U.S. Supreme Court held that a jury trial is not constitutionally required in a juvenile court's adjudication. *McKeiver* emphasized that if a state decides to offer jury trials in juvenile adjudications that it would be the state's privilege and not its obligation. After *McKeiver*, a minority of states extended the right to a jury trial in juvenile adjudications if certain circumstances are met. See, e.g., Kan. Stat. Ann. § 38-2357 (2021) (granting juveniles right to request jury trial); Mass. Gen. Laws Ann. ch. 119, § 55A (West 2017) (requiring trial by jury unless waived); *RLR v. State*, 487 P.2d 27 (Alaska 1971) (holding Alaska constitution guarantees juvenile's right to jury trial). However, Nebraska is not one of those states.

[6] The Nebraska Supreme Court has held that a juvenile court proceeding, under the controlling statute in the State of Nebraska, is a civil proceeding, and under the doctrine of parens patriae, the constitutional guarantees of a jury trial and the incidents thereto are not applicable to a juvenile proceeding. *In re Interest of Zoie H., supra*. Under § 43-279(1), "[t]he adjudication portion of hearings shall be conducted before the court without a jury, applying the customary rules of evidence in use in trials without a jury." A juvenile adjudication does not result in a conviction and sentence; instead, when a juvenile is adjudicated for acts which would constitute a

- 944 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

felony, Neb. Rev. Stat. § 43-286 (Cum. Supp. 2020) sets out the dispositional options available to the juvenile court. *In re Interest of Zoie H*., *supra*. Even when the disposition is similar to that imposed as punishment for a crime, the Supreme Court has not found the disposition to be punishment. *Id*.

Here, Quiotis argues that because a juvenile is charged with a felony, there is no real distinction between charging a defendant criminally and in a juvenile adjudication; rather, the distinction is made purely on the "basis of labels." Brief for appellant at 27. But it has long been held that a juvenile adjudication is not a criminal proceeding, so there is no constitutional right to a jury trial. *In re Interest of Zoie H., supra*. See, also, *McKeiver v. Pennsylvania, supra; McMullen v. Geiger*, 184 Neb. 581, 169 N.W.2d 431 (1969). Furthermore, there are many distinctions between a criminal trial and a juvenile adjudication beyond just labels. For example, juvenile adjudications are civil in nature, and dispositions of juvenile adjudications are not punishment. See *In re Interest of Zoie H., supra*. The purpose of these statutes for juvenile adjudication is the education, treatment, and rehabilitation of the child, rather than retributive punishment, which is why the proceedings are described as civil instead of criminal. *In re Interest of Laurance S.*, 274 Neb. 620, 742 N.W.2d 484 (2007). Quiotis' argument that the denial of a jury trial violates his constitutional rights fails.

### (b) Unconstitutionality of § 43-279

Quiotis assigns that § 43-279 is unconstitutional because it violates his constitutional right to a trial by jury under the Nebraska and U.S. Constitutions. However, Quiotis never challenged the constitutionality of this statute in the juvenile court. Although he argued a denial of a jury trial violated his constitutional rights, he did not specifically challenge § 43-279 as unconstitutional, nor did he include it in the list of statutes whose constitutionality he challenged in his motion to declare statutes unconstitutional. Thus, the issue was not

- 945 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

presented to the juvenile court and the juvenile court did not address the statute's constitutionality.

When an issue is raised for the first time in an appellate court, it will be disregarded inasmuch as a lower court cannot commit error in resolving an issue never presented and submitted to it for disposition. See, *V.C. v. Casady*, 262 Neb. 714, 634 N.W.2d 798 (2001); *Maxwell v. Montey*, 262 Neb. 160, 631 N.W.2d 455 (2001). Accordingly, we do not consider Quiotis' constitutional challenge to § 43-279.

### (c) Structural Error Doctrine

[7] Quiotis' argument that the juvenile court's denial of a jury trial is structural error fails for the same reasons his claim that he has a constitutional right to a jury trial fails. The purpose of the structural error doctrine is to ensure insistence on certain basic, constitutional guarantees that should define the framework of any criminal trial. *Weaver v. Massachusetts*, 582 U.S. 286, 137 S. Ct. 1899, 198 L. Ed. 2d 420 (2017). Because the structural error doctrine applies to criminal proceedings and a juvenile adjudication is a civil proceeding, Quiotis' argument is inapplicable. Therefore, the juvenile court did not err by denying Quiotis a jury trial.

### 3. SUFFICIENCY OF EVIDENCE

Quiotis attacks the juvenile court's finding that the evidence was sufficient to find he tampered with evidence and was a minor in possession of a firearm. Within his argument, he attacks both witness credibility and the sufficiency of the underlying facts.

### (a) Witness Credibility

Quiotis assigns the juvenile court was clearly erroneous in finding R.S.' and Summers' testimony credible. He argues that R.S. and Summers did not tell "officials that a fanny pack existed after the incident." Brief for appellant at 29. He contends that Quiotis' mother, Butler, and Quiotis all testified that Quiotis did not have a fanny pack that day. He concludes

- 946 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

that R.S. and Summers were impeached, so the juvenile court clearly erred in finding their testimony credible.

[8,9] The standard of review for juvenile cases is de novo on the record; however, when evidence is in conflict, the appellate court may give weight to the fact that the trial court observed the witnesses and accepted one version of the facts over the other. *In re Interest of Gunner B.*, 312 Neb. 697, 980 N.W.2d 863 (2022). An appellate court will not reevaluate the credibility of witnesses or reweigh testimony but will review the evidence for clear error. *Eicher v. Mid America Fin. Invest. Corp.*, 275 Neb. 462, 748 N.W.2d 1 (2008).

Here, the juvenile court's finding that R.S. and Summers were credible witnesses was not clearly erroneous. It found Quiotis "brought a firearm to the home of Robert Stolinski. This finding of fact was based on the testimony of the minor child R.S., . . . Summers, and other evidence received during the adjudication." It also found that Quiotis "used the firearm he possessed to fire at least two shots." R.S. acknowledged his prior inconsistent deposition testimony but assured the court that he was testifying truthfully. The juvenile court did not err in finding his testimony credible. And Summers' testimony that Quiotis may have had a fanny pack was not inconsistent with his prior report that he had "something" in his hand. The court did not err in determining that Summers' credibility was not impeached. See *State v. Stevens*, 290 Neb. 460, 472, 860 N.W.2d 717, 729 (2015) (providing trial court "considerable discretion in determining whether testimony is inconsistent with prior statements").

R.S. testified he observed Quiotis with a fanny pack the day of the shooting. Quiotis' counsel challenged R.S.' testimony based on the testimony R.S. provided in a previous deposition. When asked about the differences, R.S. acknowledged the discrepancy but maintained that he witnessed Quiotis with a fanny pack earlier in the day and saw the handle of a handgun in it. The juvenile court was in the best position to judge R.S.' credibility, and we will not second guess it.

- 947 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

Summers reported in his 911 call that the individual hiding in the field was "running [with] something in his hands," but it did not appear to be a gun. Summers told officers during a followup call on September 19, 2022, that he believed the person in the field was holding "a bag or something." Although Quiotis argues on appeal that Summers testified that he saw Quiotis "with a fanny pack," the record adds additional context to show why Quiotis' claim does not accurately reflect Summers' testimony. Summers testified that he saw Quiotis in the field with "some kind of bag, a dark-colored backpack or fanny pack or something. It could have been a grocery sack or something." Summers described the item "had a strap but I couldn't tell if it was a fanny pack or a backpack [or] something." The juvenile court's finding of Summers' credibility was not clearly erroneous.

(b) Evidence Regarding Underlying Violations

[10] When an adjudication is based upon Neb. Rev. Stat. § 43-247(1), (2), (3)(b), or (4) (Reissue 2016), the allegations must be proved beyond a reasonable doubt. § 43-279(2). *In re Interest of Gabriel P.*, 29 Neb. App. 431, 954 N.W.2d 305 (2021). Although an adjudication is not a criminal proceeding, we take guidance from the criminal laws of this state. *Id*.

*(i) Tampering With Physical Evidence*

Quiotis assigns the juvenile court erred in finding sufficient evidence to support a violation of the tampering with physical evidence statute. See § 28-922. He argues that the State failed to establish each element of the violation, namely, there was no official proceeding initiated on September 5, 2022, and the gun was not destroyed, mutilated, defaced, or in any way altered when abandoned.

Under § 28-922(1):

A person commits the offense of tampering with physical evidence if, believing that an official proceeding is pending or about to be instituted and acting without legal right or authority, he or she:

- 948 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

(a) Destroys, mutilates, conceals, removes, or alters physical evidence with the intent to impair its verity or availability in the pending or prospective official proceeding[.]

Physical evidence is defined under § 28-922(2) as "any article, object, document, record, or other thing of physical substance." Because we determine that the juvenile court did not err in finding sufficient evidence that Quiotis violated the unlawful possession of a handgun statute as explained below, Quiotis did not have legal right or authority to dispose of physical evidence.

Quiotis first argues that there was no pending official proceeding when he discarded the gun; therefore, the requirements of § 28-922(1) cannot be met. However, Quiotis testified that he did not want the police to find him with the handgun so he disassembled it and concealed its pieces in the tree line. Contrary to Quiotis' argument, the statute does not require that there be a pending proceeding. It is sufficient if the defendant believes that an official proceeding is about to be instituted. In *State v. Lasu*, 278 Neb. 180, 768 N.W.2d 447 (2009), the Supreme Court stated that the fact that a defendant discarded a bag of marijuana while being followed by police was sufficient to determine the defendant did so because he believed an official proceeding was about to be instituted. It concluded, "It is reasonable to infer that [the defendant] threw away his marijuana because he was afraid of being arrested and searched . . . ." *Id*. at 184, 768 N.W.2d at 451.

Quiotis recognized that police involvement was likely, and he did not want them to discover the gun in his possession. Although he testified he was afraid of being shot by police, it is reasonable to infer that he was afraid of being arrested and searched. The evidence was sufficient to find that he believed an official proceeding was about to be instituted.

Quiotis also argues the evidence was insufficient to find that he destroyed, mutilated, concealed, removed, or altered

- 949 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

physical evidence with the intent to impair its availability. He testified that he did not want to leave the handgun at the scene of the crime, nor did he want another person to be able to use the handgun after he disposed of it. His solution was to disassemble the handgun and leave the pieces scattered underneath trees, thus removing the handgun from the scene of the crime. He asserts that his actions are comparable to the defendant's actions in *State v. Lasu, supra*. We disagree.

[11,12] In *Lasu*, the defendant had been the victim of an assault. After responding officers arrived at the gas station where the assault occurred, the defendant asked to use the restroom. On his way, he discarded a bag of marijuana into a large cardboard bin of snack foods, where it landed on top. The officers immediately retrieved the bag and arrested him. The Supreme Court distinguished between discarding, concealing, or removing evidence with the intent to impair its availability and merely abandoning evidence. It held that the crime of tampering with physical evidence, as defined by § 28-922, does not include mere abandonment of physical evidence in the presence of law enforcement. *State v. Lasu, supra*. It explained that to "conceal" or "remove" physical evidence, in the context of § 28-922, is to act in a way that will prevent the evidence from being disclosed or recognized. *State v. Lasu, supra*. A person is not guilty of tampering with evidence when the evidence at issue is made more apparent, rather than less apparent. See *id*. Because the defendant did not attempt to conceal the bag, but, rather, attempted to conceal his possession of the bag, his actions did not constitute tampering.

Unlike the defendant in *Lasu*, Quiotis removed the handgun from the scene, outside of the presence of law enforcement, disassembled it, and scattered the pieces underneath the trees, making the possibility of finding the evidence less apparent. (Contrast *State v. Lasu*, 278 Neb. at 185, 768 N.W.2d at 452, in which court stated it was not "a case in which the defendant placed evidence where it was unlikely to be discovered").

- 950 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

The difficulty in finding the pieces of the handgun is highlighted by the fact that officers had to be redirected by Summers to the proper area to search. Quiotis did not merely abandon the handgun; he removed it from the crime scene, altered its appearance, and scattered the pieces underneath 10 to 15 feet of tree line.

The juvenile court did not err in finding sufficient evidence that Quiotis violated the tampering with physical evidence statute.

### (ii) Unlawful Possession of Handgun

Quiotis assigns the juvenile court erred in finding sufficient evidence that he violated the unlawful possession of a handgun statute. See § 28-1204. He argues that any rational trier of fact could not have found the essential elements were met to find Quiotis was unlawfully in possession of a handgun.

Under § 28-1204(1), "any person under the age of eighteen years who possesses a handgun commits the offense of unlawful possession of a handgun." Subsection (2) provides exceptions for certain situations in which subsection (1) does not apply; however, none of those exceptions apply to this case. Black's Law Dictionary 1407 (11th ed. 2019) defines "possess" as "[t]o have in one's actual control; to have possession of." Essentially there are two elements to prove that a person violated § 28-1204, which are that the person (1) was under the age of 18 and (2) had a handgun in their actual control.

Here, there was sufficient evidence to find Quiotis violated § 28-1204, as both elements were met. Quiotis testified that he was 15 years old at the time of trial, which means he was a person under the age of 18 at the time of the shooting. There is no dispute that Quiotis shot Parker, which meant he possessed the handgun. Quiotis testified that he possessed the handgun to protect his father. Furthermore, the juvenile court specifically found that Quiotis brought the handgun to the pool party. Both elements of unlawful possession of a firearm were satisfied; thus, there was sufficient evidence to find that Quiotis violated § 28-1204.

- 951 -

Nebraska Court of Appeals Advance Sheets
32 Nebraska Appellate Reports
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

Quiotis argues on appeal that there was not sufficient evidence at trial to show that he carried around a fanny pack with a handgun inside; thus, he cannot be convicted of unlawful possession of a handgun. This contention is misguided for two reasons.

First, as described above, Quiotis failed to show that the juvenile court's finding of R.S.' and Summers' credibility was clearly erroneous. Because the juvenile court was not clearly erroneous in finding R.S. and Summers credible, we will not reevaluate their credibility. See *Eicher v. Mid America Fin. Invest. Corp.*, 275 Neb. 462, 748 N.W.2d 1 (2008). The juvenile court's finding of fact that Quiotis brought the handgun to the party based on R.S.' and Summers' testimony is enough evidence to show that Quiotis possessed the handgun prior to the shooting.

Second, regardless of Quiotis' possession of the fanny pack, Quiotis admits in his brief that he possessed the handgun "to defend his father and the life of his father." Brief for appellant at 30. This admission satisfies one of the elements of § 28-1204, that Quiotis possessed a handgun, and his admission at trial that he is under the age of 18 satisfies the other element. Therefore, Quiotis' arguments fail.

## 4. Prosecutorial Misconduct

Quiotis assigns that the prosecutor committed misconduct by allowing Summers to testify that he observed Quiotis with a fanny pack, despite telling the 911 operator that he did not know what was in Quiotis' hand. This alleged error has been waived.

[13] Quiotis never moved for a mistrial or claimed that the prosecutor committed misconduct in the juvenile court. A party who fails to make a timely motion for mistrial based on prosecutorial misconduct waives the right to assert on appeal that the court erred in not declaring a mistrial due to such prosecutorial misconduct. *State v. Mrza*, 302 Neb. 931, 926

- 952 -

NEBRASKA COURT OF APPEALS ADVANCE SHEETS
32 NEBRASKA APPELLATE REPORTS
IN RE INTEREST OF QUIOTIS C.
Cite as 32 Neb. App. 932

N.W.2d 79 (2019). Because Quiotis did not move for a mistrial, this alleged error is waived.

## VI. CONCLUSION
For the foregoing reasons, we affirm.

AFFIRMED.