IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF KAMARCUS M.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF KAMARCUS M., A CHILD UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,

V.

MARCUS B., APPELLANT, AND KEYSHLA M., APPELLEE.

Filed May 20, 2025.    No. A-24-659.

Appeal from the County Court for Lincoln County: JOEL B. JAY, Judge. Affirmed.

Chevas Shaw, of Shaw Law, L.L.C., for appellant.

Kortnei Smith, Deputy Lincoln County Attorney, for appellee State of Nebraska.

RIEDMANN, Chief Judge, and MOORE and ARTERBURN, Judges.

ARTERBURN, Judge.

### INTRODUCTION

Marcus B. appeals the order of the Lincoln County Court, sitting as a juvenile court, terminating his parental rights to his child, KaMarcus M. Upon our de novo review, we affirm the juvenile court's order.

### BACKGROUND

Marcus and Keyshla M. are the parents of KaMarcus, born in December 2022. At the time of KaMarcus' birth, Marcus and Keyshla were in a romantic relationship. They subsequently married in May 2023, during the pendency of the juvenile court proceedings. Notably, Marcus is the father of five older children, each by a different mother. The children live in different states, and Marcus does not appear to have maintained a relationship with these children.

- 1 -

While both Marcus' and Keyshla's parental rights to KaMarcus were terminated by the juvenile court, only Marcus has filed an appeal from that decision. As such, in our recitation of the facts, we focus on Marcus' relationship with KaMarcus, but discuss Keyshla where needed to provide context.

Less than 1 month prior to KaMarcus' birth, in November 2022, law enforcement officers responded to a domestic violence incident involving Marcus and Keyshla. Marcus reported that Keyshla had thrown a ceramic plate at him and that it had caused a laceration on his wrist. Keyshla was arrested, but was soon released on bond with an order not to contact Marcus. On December 13, Keyshla went to the hospital with self-inflicted injuries. Because it was her due date, hospital staff convinced Keyshla to stay so that labor could be induced.

While Keyshla was in labor, she told hospital staff that "if Marcus does not come up to the hospital and be with her, she is not going to let their baby live." Keyshla tested positive for THC and admitted to using drugs 1 week prior to December 13, 2022. Keyshla also admitted that Marcus regularly smokes marijuana in their home and that there is domestic violence within their home. Subsequent testing of KaMarcus revealed that THC was present in his meconium. He was removed from Marcus' and Keyshla's care immediately after his birth and placed in a foster home, where he continues to reside.

On December 15, 2022, the State filed a petition to adjudicate KaMarcus as to both parents pursuant to Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). The petition generally alleged that KaMarcus "was in a situation or engaged in an occupation dangerous to life or limb or injurious to [his] health or morals." At a hearing on January 10, 2023, Marcus appeared and denied the allegations contained in the petition. The juvenile court ordered paternity testing to be conducted to ensure that Marcus was KaMarcus' biological father. At the next scheduled hearing, on January 24, Marcus failed to appear. The juvenile court noted that it had not yet received any results of genetic testing from Marcus. Later, at a hearing held on February 28, Marcus appeared and indicated that genetic testing had still not been completed. The juvenile court ordered him to appear for genetic testing on March 1. The court also suspended his visitations with KaMarcus until such time as genetic testing was completed and revealed him to be KaMarcus' biological father.

On April 18, 2023, a hearing was held. Although Marcus failed to appear at the hearing, the court did receive the results of the genetic testing which demonstrated that Marcus was KaMarcus' father.

The State filed an amended juvenile court petition on June 5, 2023. Marcus entered a plea of no contest to the allegations in the amended petition and KaMarcus was adjudicated pursuant to § 43-247(3)(a) as to Marcus. After the adjudication, the juvenile court ordered Marcus to comply with various requirements of a case plan designed to facilitate reunification between Marcus and KaMarcus. The tenets of that case plan included completing a domestic violence education program; cooperating with drug patch testing; and submitting to a parenting assessment, psychological evaluation, and substance abuse/chemical dependency evaluation. Marcus was also provided with supervised visitation with KaMarcus.

On April 9, 2024, the State filed a motion to terminate Marcus' parental rights, alleging that statutory grounds existed under Neb. Rev. Stat. § 43-292(2), (4), (6), and (7) (Reissue 2016) and that termination was in KaMarcus' best interests.

A termination hearing was held in July 2024. Marcus was not present at the hearing, but was represented by counsel. During the hearing, the State presented evidence that during the 19 months the juvenile court proceedings had been pending, Marcus committed multiple criminal acts and was jailed on multiple occasions; that he failed to address his mental health or comply with substance abuse testing; and that he continued to engage in a violent and tumultuous relationship with Keyshla. The State also presented evidence to demonstrate that Marcus was not capable of properly parenting KaMarcus.

On February 28, 2023, about 2 months after KaMarcus' birth and subsequent removal, Keyshla filed a petition asking for a domestic abuse protection order against Marcus. In the petition, she alleged that Marcus had punched her in the face earlier in February and that he continually threatened her with physical violence. Keyshla indicated that she feared for her life. An ex parte protection order was issued by the district court, but Keyshla later filed a motion to vacate the protection order. Soon after, Marcus and Keyshla married.

In March 2023, Marcus was charged with numerous criminal offenses in Keith County, including: possession of a firearm by a prohibited person, possession of a stolen firearm, strangulation, failure to register as a sex offender, third degree assault, theft by taking (less than $500), and possession of marijuana and drug paraphernalia. Pursuant to a plea agreement with the State, Marcus pled no contest to third degree assault and possession of marijuana and drug paraphernalia. He was sentenced to 30 days in jail.

In May 2023, shortly after being released from jail, Marcus was charged with violating a protection order, which had been granted in favor of another woman. Marcus ultimately pled no contest to disturbing the peace and was sentenced to 5 days in jail. One month later, in June 2023, Marcus was charged with third degree domestic assault after he was involved in a physical altercation with Keyshla. Marcus pled no contest to the charge and was sentenced to 60 days in jail. Marcus was again charged with third degree domestic assault on Keyshla in September 2023. Keyshla reported to law enforcement that Marcus had pushed her down the stairs during an argument. Marcus pled no contest to the charge and was sentenced to 30 days in jail. Keyshla also reported to her family support worker that Marcus had told her that if she ever wanted to leave him, she would need to kill herself or he would kill her.

In the month prior to the termination hearing, the caseworker assigned to the family, Chris Jones, by the Department of Health and Human Services (the Department), lost contact with Marcus. She last spoke with Marcus in May 2024. Upon doing some research to find Marcus, she located him in the Kenosha County, Wisconsin, jail. Records from the jail indicated that Marcus was facing numerous charges, including obstructing a law enforcement officer; battery or threat to a law enforcement officer; operating a motor vehicle while intoxicated; and carrying a concealed knife. Jones testified that at the time of the termination hearing in July 2024, Marcus remained incarcerated in Wisconsin.

When Marcus was not in jail during the juvenile court proceedings, the evidence revealed that he failed to comply with his court-ordered rehabilitation plan. During the 19 months the case was pending before the juvenile court, Marcus was not compliant with drug patch testing. He allowed four drug patches to be affixed to his person. Two of those patches were not tested because Marcus reported that one fell off in the shower and he simply failed to turn in the other one. The

other two patches tested positive for some form of THC. Marcus never provided proof that he ever attended any type of substance abuse therapy or treatment.

In January 2024, Marcus participated in a psychological evaluation. This evaluation was completed remotely and Marcus "spent the entire interview and testing lying in bed without his shirt on, holding his cell phone while he smoked cigarettes." Dr. John Meidlinger, the clinical psychologist who performed the evaluation, opined that Marcus was suffering from schizophrenia and personality disorder. Meidlinger observed Marcus to be suffering symptoms such as "a limited range of social skills[] and poor judgment in regard to himself and relationships. He also exhibits distrust and uses projection as a primary defense." Meidlinger stated that the implication of Marcus' diagnoses and symptoms included the following features:

> He exhibits a lack of interest in learning more about caring for his son and was described as doing a very poor job of interacting with his son when he had the opportunity. . . . [He] has continuing problems with criminal behavior, poor impulse control, and a lack of relationships connecting him to the outside world. He was rather defensive and minimized the information he provided to me during his interview and seems to have no interest in developing a deeper understanding of himself as a person, a partner in an intimate relationship, and a parent. Taken together, these present an overwhelming obstacle to his ability to parent his son.

Meidlinger concluded his evaluation by stating that, in his opinion, any contact Marcus has with KaMarcus is detrimental to KaMarcus:

> I would strongly recommend against Marcus having contact with his son until he's been able to demonstrate an extended period of stability (a year or more) in which he is able to maintain relationships, avoid altercations with the law, manage domestic violence, and demonstrate an ability to develop ties to the outside world.

Marcus failed to attend any individual counseling sessions. He also failed to complete a court ordered anti-violence program, despite Jones' repeated attempts to sign him up for such a program. When Marcus would communicate with Jones about the case, he was "volatile, yelling, [and] cussing." Eventually all communication had to go through his lawyer. Marcus failed to regularly attend monthly family team meetings.

Marcus demonstrated an inability to appropriately parent KaMarcus during his visitation time. Over the course of the juvenile court proceedings, Marcus' visitation time with KaMarcus was reduced to 1 hour, one time per week at a visitation center. Marcus' inconsistent attendance and volatile behavior necessitated the changes. Marcus only attended an average of one scheduled visit per month.

When he did attend visits, two visitation workers had to be present to control Marcus' behaviors and to keep KaMarcus safe. Despite these safeguards, Marcus made negative and threatening comments about people involved in the juvenile court proceedings. He refused to listen to instruction or redirection from the visitation workers, including about what foods were appropriate for KaMarcus. Marcus refused to feed KaMarcus the healthy and age appropriate foods provided for visits by the foster parents. Instead, he brought 1-year-old KaMarcus gummy candy to eat. During most visits, Marcus forced KaMarcus to watch videos on his cell phone, even though

KaMarcus was not interested in this activity. Toward the latter part of the proceedings, in early 2024, KaMarcus began having negative reactions to visits with Marcus, including vomiting; pulling his hair out; not sleeping; and wanting to be held constantly by his foster parents. Marcus' last visit with KaMarcus was in April 2024, almost 3 months prior to the termination hearing.

Outside of visits, Marcus failed to demonstrate an ability to care for KaMarcus' basic needs. He did not attend any of KaMarcus' doctor's appointments. He failed to secure stable housing so that KaMarcus would have an appropriate and safe place to reside if reunification was achieved. And, Marcus failed to apply for insurance or other benefits for KaMarcus despite assistance with this process from Jones.

In August 2023, Marcus participated in part of a parenting evaluation with Joan Schwan. He attended the portion of the evaluation in which Schwan observed him with KaMarcus. He failed to complete any of the remaining assessments required in order to accomplish a complete evaluation.

During Schwan's evaluation, she observed that "KaMarcus was completely mute for the first 35 minutes of the visit, not making a sound, when [Schwan had previously observed him] to coo and babble." Schwan found this behavior to be "extremely worrisome," as it indicated that KaMarcus was utilizing self-protection behaviors and was shutting down around Marcus. Throughout the observation period, Marcus demonstrated a lack of understanding about KaMarcus' abilities; showed frustration when KaMarcus did not do want Marcus wanted; and had no insight into KaMarcus' cues. Schwan thought that Marcus' play style was very aggressive, especially when considering KaMarcus' young age.

Ultimately, Schwan opined, even without the complete evaluation, that Marcus presented "as entitled, his needs must be met, he lacks empathy for others, and rules do not seem to apply to him." She found this to be a "high-risk case" and noted:

> [Marcus'] capacity to change is rated as less than poor. He has had years of issues with no meaningful change. He in fact does not see the need to change, it is everyone else's problem. He did not participate in this assessment in a meaningful way, he became agitated when small accountability was requested, he has not taken advantage of services offered to him to date.

Schwan recommended that Marcus' visits with KaMarcus stop immediately until he "demonstrates stability as evidenced by attending counseling, attending anti-violence group, having clean patches, and having no further law violations." She explained, "[Marcus] is a time bomb waiting to go off. We cannot wait for this to happen in front of KaMarcus."

At the close of Jones' testimony, she opined that termination of Marcus' parental rights was in KaMarcus' best interests. She based her opinion on the lack of progress toward reunification made by Marcus despite the Department exhausting all possible resources to assist Marcus. Jones explained that the Department had "provided all of the reasonable efforts of reunification" that Marcus would allow. Despite these efforts, Marcus continued to engage in domestic violence with Keyshla; continued to engage in other criminal acts; and demonstrated extreme inconsistency in his desire to be a part of KaMarcus' life.

The juvenile court entered its order on August 2, 2024, terminating Marcus' parental rights. It found that termination was warranted pursuant to § 43-292(2), (4), (6), and (7), as alleged by the

State in the motion to terminate. It also found that termination of Marcus' parental rights was in KaMarcus' best interests.

Marcus appeals from the juvenile court's order here.

## ASSIGNMENTS OF ERROR

On appeal, Marcus assigns and argues four errors by the juvenile court. First, he asserts that the juvenile court erred in denying his motion to continue the termination hearing. Second, he asserts that the court erred in permitting Schwan, who performed Marcus' parenting assessment, to testify over his objection to her opinion that termination of Marcus' parental rights was in KaMarcus' best interests. Third, he challenges the juvenile court's finding that the State proved statutory grounds to terminate his parental rights by clear and convincing evidence. Fourth, he argues that the juvenile court erred in finding that termination of his parental rights is in KaMarcus' best interests.

## STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the juvenile court's findings. *In re Interest of Jordon B.*, 316 Neb. 974, 7 N.W.3d 894 (2024). When the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023).

## ANALYSIS

*Motion to Continue.*

As we stated above, Marcus did not appear at the termination hearing but was represented by his counsel. Upon noticing Marcus' absence, the juvenile court indicated on the record that Marcus had been given notice of the date and time of the termination hearing at a previous hearing and had acknowledged receiving such notice.

However, at the start of the termination hearing, Marcus' counsel stated, "I guess I would move to continue on behalf of my client. He's unable to appear today." When the juvenile court questioned counsel about where Marcus was, counsel explained that to the best of counsel's knowledge, he remained incarcerated in Wisconsin. The court again noted that Marcus had received notice of the termination hearing. It then denied counsel's motion to continue, explaining, "[A]nd we haven't received anything otherwise in writing to ask to delay it. This has been set for some time. I am going to deny your request to continue, but will note that it was made."

On appeal, Marcus contends that the juvenile court erred in denying the request for a continuance. The substance of Marcus' argument on this issue is essentially one sentence: "[In t]he case at hand [Marcus] was unfairly deprived of a substantial right, namely the right to be present at a hearing affecting a constitutionally protected right to and relationship with his son." Brief for appellant at 11. This is not sufficient to secure appellate review of the issue. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting error to be considered by the appellate court. *In re Interest of Quiotis C.*, 32 Neb. App. 932, 9 N.W.3d 224 (2024). An argument that does little more than restate an assignment of error does not support the assignment, and an appellate court will not address it. *Id*. Here, Marcus fails to offer any specific

reason as to why the juvenile court erred in denying his motion to continue. Because Marcus failed to properly argue his assertion, we decline to address this assignment of error.

*Statutory Grounds.*

Marcus assigns that the juvenile court erred in finding clear and convincing evidence to terminate his parental rights pursuant to § 43-292(2), (4), (6), and (7). Upon our de novo review, we find that the State presented clear and convincing evidence to support termination of Marcus' parental rights under § 43-292(7). Proof of one statutory ground is needed for termination, and the record clearly shows that statutory grounds for termination of Marcus' parental rights exist under § 43-292(7).

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021). In a case of termination of parental rights based on § 43-292(7), the protection afforded the rights of the parent comes in the best interests step of the analysis. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019).

KaMarcus was removed from his parents' care in December 2022, almost immediately after his birth. Since the date KaMarcus was removed, he has never returned to Marcus' care and has remained in an out-of-home placement. At the time the State filed the motion for termination of parental rights on April 9, 2024, KaMarcus had been placed outside the home for almost 16 months out of the most recent 22 months. Therefore, KaMarcus had been out of the home for more than 15 of the most recent 22 months and the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al., supra*. Because we find that the State presented clear and convincing evidence that a statutory ground to terminate existed under § 43-292(7), we need not address the other statutory grounds.

*Best Interests.*

Marcus finally assigns that the juvenile court erred in finding that it was in KaMarcus' best interests to terminate Marcus' parental rights. Under § 43-292, in addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). A parent's right to raise his or her child is constitutionally protected; so before a court may terminate parental rights, the State must show that the parent is unfit. *Id*. There is a rebuttable presumption that the best interests of the child are served by having a relationship with his or her parent. *Id*. Based on the idea that fit parents act in the best interests of their children, this presumption is overcome only when the State has proved that the parent is unfit. *Id*. In the context of the constitutionally protected relationship between a parent and a child, parental unfitness means a personal deficiency or incapacity which has prevented, or will probably prevent, performance of a reasonable parental obligation in child

rearing and which caused, or probably will result in, detriment to the child's well-being. *Id*. The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *Id*. And while both are separate inquiries, each examines essentially the same underlying facts. *Id.*

In his brief on appeal, Marcus argues that the State failed to prove KaMarcus' best interests required termination because there was evidence presented to demonstrate that Marcus desires to have a relationship with KaMarcus and has demonstrated such a desire by being a part of KaMarcus' life despite the barriers put in place by the Department and the juvenile court proceedings. Given our review of the record, we disagree with Marcus' contentions on appeal and find no abuse of discretion in the juvenile court's finding that termination of Marcus' parental rights is in KaMarcus' best interests.

The evidence presented at the termination hearing revealed that Marcus did not regularly or consistently attend visits with KaMarcus. Throughout the juvenile court proceedings, Marcus was jailed on numerous occasions for his criminal activities and was simply unable to attend his visits. However, even when he was not in jail, he still did not attend visits on a regular basis. This was true even when his visits were reduced to 1 hour per week. Marcus' visits with KaMarcus were always fully supervised, usually by two visitation workers to ensure KaMarcus' safety from Marcus' acerbic and erratic behaviors. Schwan testified that when she observed Marcus and KaMarcus together, it was clear that KaMarcus was not bonded to Marcus and, in fact, demonstrated some fear of Marcus. Additionally, the foster parents provided information to the Department which indicated that KaMarcus had extremely negative reactions to his time with Marcus, including vomiting, pulling out his own hair, and not sleeping.

Throughout the juvenile court proceedings, Marcus failed to take any real steps toward demonstrating he was a capable parent for KaMarcus. He did not address his mental health problems. He did not cooperate with drug testing nor did he engage in any programming designed to help him maintain sobriety. He did not have safe and stable housing. He did not address his violent relationship with KaMarcus' mother, Keyshla. In fact, many of Marcus' arrests during the juvenile court proceedings related to his physical assaults on Keyshla. In short, Marcus demonstrated no motivation to make any changes that would allow him to appropriately parent Kamarcus.

All of the professionals involved in this case expressed serious doubts that Marcus could ever become a safe and stable parent capable of parenting KaMarcus. They described Marcus as "a danger," a detriment to KaMarcus, and "a time bomb waiting to go off." And, given our careful review of the record, we cannot disagree with the opinions of these professionals or the decision of the juvenile court that termination of Marcus' parental rights is in KaMarcus' best interests. Children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. *In re Interest of Cameron L. & David L.*, 32 Neb. App. 578, 3 N.W.3d 376 (2024). The evidence presented at the termination hearing overwhelmingly demonstrated that Marcus is not currently a fit parent or that he will become a fit parent in the near future. KaMarcus deserves safety and permanency which Marcus is unwilling or unable to provide him.

*Admissibility of Opinion Testimony.*

During Schwan's testimony regarding Marcus' parenting evaluation, she testified to her opinion that Marcus does not have the ability to appropriately parent KaMarcus and that

KaMarcus' best interests require that he achieve permanency as soon as possible. She then went on to opine that KaMarcus' best interests require termination of Marcus' parental rights. Marcus' counsel objected to this testimony, arguing that her opinion constituted a "legal conclusion." The juvenile court overruled the objection.

On appeal, Marcus asserts that the juvenile court erred in overruling his objection to Schwan's opinion that termination was in KaMarcus' best interests. While he acknowledges that the court did not mention this testimony in its order, he asserts that "such an opinion being allowed into evidence was prejudicial towards [Marcus]." Brief for appellant at 16. We note that Marcus did not object to similar testimony elicited from Jones. Nor was there any objection to the remainder of Schwan's testimony regarding her observations and conclusions regarding Marcus' parenting abilities and KaMarcus' responses to him.

We have previously recognized that the Nebraska Evidence Rules do not apply in cases involving the termination of parental rights. See, e.g., *In re Interest of Aly T. & Kazlynn T.*, 26 Neb. App. 612, 921 N.W.2d 856 (2018). Instead, due process controls and requires that the State use fundamentally fair procedures before a court terminates parental rights. *Id*. In determining whether admission or exclusion of particular evidence would violate fundamental due process, the Nebraska Evidence Rules serve as a guidepost. *Id*.

We addressed a related but slightly different question in *In re Interest of Aly T. & Kazlynn T., supra.* In that case, the juvenile court allowed the caseworker to render an opinion with respect to the best interests of the children. On appeal, the mother argued that the caseworker was not qualified to give an expert opinion in this regard. We concluded that the caseworker's opinion testimony was based on her own observations and interactions with the mother, and that prior to rendering her opinions, the caseworker had given specific testimony regarding the mother's failure to comply with the court's prior orders and her refusal to cooperate with the Department. We also noted that the mother's counsel fully cross-examined the caseworker.

Here, Marcus does not assign or argue that Schwan was not qualified to give expert testimony regarding a child's best interests. Those qualifications were firmly established in the record. Rather, he contends that the question of whether his parental rights should be terminated is a question of law and can only be made by the court. Thus, in his view, Schwan's expert testimony on best interests was not admissible.

We find it unnecessary to resolve whether Schwan's best interests opinion concerned a question of law or fact. Even if Schwan's opinion is excluded, the remaining evidence overwhelmingly supports the court's finding that termination of Marcus' parental rights is in KaMarcus' best interests. As we have discussed, Marcus has taken few, if any, productive steps that demonstrate that he can become a fit parent in the foreseeable future. In short, even if the juvenile court did consider Schwan's opinion regarding best interests, Marcus cannot demonstrate that he suffered any prejudice.

## CONCLUSION

For the reasons set forth above, we affirm the juvenile court's order finding that statutory grounds existed to terminate Marcus' parental rights to KaMarcus. We further affirm the juvenile

court's finding that termination of Marcus' parental rights is in KaMarcus' best interests. Therefore we affirm the juvenile court's order terminating Marcus' parental rights to KaMarcus.

AFFIRMED.